IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT E. WEBBER<br>679 Dartmouth College Highway<br>Haverhill Corner, NH  03765<br><br>Plaintiff,<br><br>v.<br><br>ACADEMY FOR EDUCATIONAL DEVELOPMENT<br>1825 Connecticut Avenue, NW<br>Washington, DC  20009<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. |

## COMPLAINT FOR DAMAGES

This is a complaint by Robert E. Webber against Academy for Educational

Development ("AED") for violating the whistleblower provisions of the False Claims Act,

31 U.S.C. § 3730(h) by discharging him as an employee.  As the senior in-country executive for

AED in Afghanistan, Webber discovered fraudulent lending and accounting practices that, if

fully disclosed to USAID, would have caused that agency to cut off additional funding to AED

and its partners.  Instead of allowing Webber, a trained bank examiner, to protect the taxpayer

(and AED) from fraudulent conduct, AED systematically cut off his access to information,

curtailed his investigation of partner entities directly engaged in the fraud, and required him to

"collaborate" in the partners' efforts to cover up the fraud.  When Webber continued to insist on

doing his job, AED fired him and lied about the reason by saying that he lacked skills that had

never been viewed as necessary.

### Jurisdiction

1.      This Court has jurisdiction under 31 U.S.C. §§ 3730(h) and 3732(a).

**Parties**

2.      Robert E. Webber ("Webber") was Chief of Party for AED in connection

with the Agriculture, Rural Investment, and Enterprise Strengthening ("ARIES") Program of the

United States Agency for International Development ("USAID") in Kabul, Afghanistan.   The

Chief of Party was the most senior official for AED in Afghanistan and the person charged with

the responsibility for assuring that USAID funds were properly spent.  Since 2005, Webber has

worked on seven economic/financial sector-related USAID missions to Afghanistan and he has

traveled widely around the country.  Webber is a former Commissioned National Bank Examiner

with the Office of the Comptroller of the Currency, U.S. Treasury Department, and

President/CEO of four banks.

3.      AED is a not-for-profit entity that until recently received substantial

government contracts.  On December 8, 2010, USAID announced that it was suspending AED,

effective immediately, from receiving any further government contracts pending an ongoing

investigation by the USAID Office of Inspector General.  Initial findings by the Inspector

General regarding AED revealed evidence of serious corporate misconduct, mismanagement,

and lack of internal controls, and caused USAID to have serious concerns about corporate

integrity.  While Webber was Chief of Party in Kabul, he complained to AED officials about

serious misconduct, including fraud.  AED officials ignored Webber's complaints and when

Webber persisted in making complaints, his employment was terminated.  As of December 2010,

AED was the recipient of over $800 million in government contracts.

4.      Bonnie Barhyte was Senior Vice President of the Leadership Development

Group of AED.  Webber was part of the Leadership Development Group.  John W. Downey was

Senior Vice President and Chief Operating Officer of AED.  Stephen F. Moseley was President

and Chief Executive Officer of AED.  Mark Ketcham was Vice President of the Center for

Enterprise and Capacity Development.  All were involved in the decision to terminate Webber's

employment.  After USAID suspended AED from receiving any further government contracts,

Barhyte, Downey, Moseley, and Ketcham were, to use the words of AED's Board Chairman,

"required to depart."

## Facts

     5.     In 2006, USAID decided to provide $80 million to AED (later increased to

$100 million) as part of its three-year ARIES Program.  The goal of the ARIES Program was to

create jobs, expand access to financial services in the outlying regions of Afghanistan, and create

a strong private sector foundation for a sustainable rural finance system.  The ARIES Program

was one of the, if not the, largest rural finance projects in USAID's global development

portfolio.

     6.     After AED received the award from USAID, it entered into agreements

with five organizations that were to use the USAID funds to make loans to creditworthy Afghan

individuals and entities.  The five organizations were often referred to as AED "partners."  One

of the five organizations was Agriculture Cooperative Development International/Volunteers in

Overseas Cooperative ("ACDI/VOCA"), which received $16,498,317 in USAID funds.  The five

organizations were responsible for underwriting the proposed loans and servicing the loans after

they were made.  AED retained ultimate responsibility for assuring that USAID funds were

properly used and the five partner organizations complied with the laws of the United States.

     7.     AED began the ARIES Program in September 2006.  AED had problems

with the ARIES Program from the outset and during the Program's first year, it went through

three Chiefs of Party.  Near the end of the first year, it decided to make another change and in

January 2008, AED decided to hire Webber as Chief of Party.  The decision to hire Webber was

made after USAID had signed off on and approved the decision.

8.      In December 2007, Webber traveled to Afghanistan with Paul L. Bundick, AED's Director Field – Support Program to visit the ARIES Program, meet the partner organizations, visit the USAID mission, meet with Afghan entities that had received USAID loan funds in the first year of the ARIES Program, and conduct a preliminary assessment of the ARIES Program.  The preliminary assessment covered, among other matters, whether proper lending procedures had been followed in connection with the loans made in the first year by the five partner organizations.  Paul L. Bundick had senior responsibility for the ARIES Program. Although the ARIES Program had been operating for approximately a year during which millions in USAID funds had been advanced in loan proceeds, the December 2007 trip was Bundick's first trip to Afghanistan since the Program's launch in 2006.  This was a clear indication to Webber that governance was an issue that he had to address promptly.

9.      Webber concluded after visiting with a number of the Afghan borrower entities that they were marginal credits at best and that had the loans been properly analyzed by the five partner organizations, most of the loans would not have been made.  Webber conveyed this conclusion to Bundick and other senior AED officials in a written assessment report.

10.     From his early research into the ARIES Project, Webber knew that ACDI/VOCA had set up Afghanistan Rural Finance Company ("ARFC"), which was a not-for-profit enterprise owned entirely by ACDI/VOCA.  It had used ARFC to make its loans and it was in effect an unregulated, non-bank bank with capital provided by U.S. taxpayers through the ARIES Project.

11.     The original concept of the ARIES Program was for ACDI/VOCA to make numerous small loans to Afghan entities through credit cooperatives.  Instead of following this pattern, once ARFC was formed, it made a series of large loans to a limited number of

entities.  Webber concluded that ARFC had very limited experience in making commercial loans

and he informed senior AED officials that the limited expertise and experience of ARFC

highlighted the need for AED to closely monitor the activities of ACDI/VOCA and its subsidiary

ARFC.

12.     Webber informed AED officials of his conclusion about the change in

lending approach as reflected in the ARFC loans and the apparent poor underwriting of those

loans.  Webber also commented to Paul Bundick about the troubling relationship between senior

AED management and senior officials at ACDI/VOCA and the apparent failure of AED to

properly supervise the lending activities of ACDI/VOCA during the first year of ARIES.

13.     Webber also learned on his initial trip that ARFC had made a sizeable loan

and loan commitment to an Afghan entity in connection with a pomegranate facility.  The single

loan to this entity reached $4.3 million and represented a substantial portion of the entire loan

portfolio of ARFC.  Based on his preliminary review of the loan file, Webber determined that the

loan reflected poor underwriting and poor documentation and Webber conveyed this conclusion

to senior AED management.  Webber was concerned that the loan to the pomegranate facility

may have involved fraud, as there was virtually no documentation related to the purpose of the

loan, the use of proceeds and the ability of the borrower to repay principal and interest.

14.     On January 9, 2008, shortly after he was hired as Chief of Party, Webber

traveled to Afghanistan.  Webber intended to look closely at how AED had supervised the

lending activities of its partner organizations in connection with the millions in loans that had

been made during the first year of ARIES.  As part of his supervisory activities, Webber spent

considerable time outside Kabul visiting the partner organizations and the entities that had

received the USAID funds.

15.     In March 2008, Webber was so concerned with ARFC that he requested approval from AED that he return to the United States to discuss this matter with senior AED management.   Webber reported that ACDI/VOCA had failed to properly supervise the lending activities of ARFC thereby allowing millions in poor quality loans to be made.  Webber also told senior AED management that substantial amounts of U.S. taxpayer funds were at risk because of the inadequate supervision of the lending activities of the five partner organizations.  Webber addressed AED's approach to ARIES Program oversight and governance and he provided detailed recommendations.  After five days of meetings, Webber returned to Kabul with assurances from AED management that AED would strengthen its approach to program governance.  Webber believed that these changes were essential to prevent fraud in the program, and he was deeply concerned that fraud may have already occurred but could not be determined without further detailed investigation.  Webber's training as a bank examiner had taught him the skills to investigate such fraud and abuse, but he needed full access to available information.

16.     When Webber returned to Afghanistan, he designed and implemented the Client Visitation Program.  The purpose of the Client Visitation Program was to evaluate the loan portfolios of the five partner organizations.  The USAID mission in Kabul strongly supported the Client Visitation Program.  Nothing like the Client Visitation Program had been in place since the Program launch.

17.     In contrast to the method followed in the first year of ARIES, Webber's Client Visitation Program involved visits by him to the borrower's business, a review of all loan files, and a discussion with management about each credit.  Under the Program's design, Webber would prepare a report on each credit that would be discussed with management and then placed in the borrower's file.  USAID strongly endorsed the Client Visitation Program.  AED did not

support the Program or Webber's interest in closely monitoring the activities of the five partner organizations despite the fact that by early 2008, the ARIES program had been in operation for over a year during which period many millions in U.S. taxpayer funds had been spent.

18.     ACDI/VOCA and ARFC bitterly objected to the Client Visitation Program and they communicated with senior AED management about Webber's "interference."  AED senior management accepted the validity of these objections and it failed to support Webber and his interest in closely monitoring the way the partner organizations were making loans to Afghan entities.

19.     As part of the work Webber did in connection with the Client Visitation Program, he discovered that loan proceeds on an ARFC loan had been used to furnish assistance to companies in Iran.  The use of funds to assist Iran or companies in Iran was a violation of the United States Code, the Code of Federal Regulations, and Executive Orders.

20.     Prior to Webber discovering the illegal loans, ARFC had represented to AED that its loan portfolio was in excellent shape, including the fact that none of its borrowers were past due on their loans.  As ARFC was aware, AED had made representations to USAID about the use of USAID funds that were based on information disclosed by ARFC.  ARFC had made the representations to AED about its loan portfolio in connection with its requests for additional capital at a faster pace.  Upon information and belief, certain of these representations were false, and AED was able to obtain continued funding based on these false representations. Upon information and belief, AED shut down and/or curtailed Webber's investigation because it feared that he would discover information that would show the falsity of representations that it had made or planned to make to USAID.

21.     Webber was required as Chief of Party to inform USAID and AED about the unlawful use of loan funds.  After Webber disclosed to USAID the use of loan proceeds to assist companies in Iran, USAID concluded that Webber had identified a serious problem including possible violations of the Foreign Assistance Act of 1961 as amended, USAID source/origin/nationality rules found in 22 C.F.R. 228, Department of Treasury OFAC Anti-Terrorism Sanctions, and OFAC Iran Sanctions.

22.     After Webber informed AED and USAID about the possible use of taxpayer monies to assist companies in Iran, AED's senior management criticized him for taking this action.  The criticisms included that (a) he had notified USAID without first notifying AED; (b) Webber's actions in informing USAID "undermines our role as prime on ARIES"; (c) Webber made it appear that AED was "incapable" of managing ACDI/VOCA; and (d) this action by Webber made ACDI/VOCA "quite defensive and somewhat distrustful of AED's ultimate intentions."

23.     AED senior management insisted that Webber adopt a "collaborative" approach.  AED apologized to ACDI/VOCA for Webber's behavior, a step that management described as a "positive step," and management told Webber that he needed to take steps to "re-build confidence."  Webber continued his close supervision of ARFC and he so informed AED management.

24.     What senior management meant by the instruction to take a "collaborative" approach was made clear in an email from Barhyte in which Webber was instructed not to "run immediately to USAID" with violations of law and other problems because such behavior might cause USAID to issue more letters and take action against AED.  Upon information and belief, what AED meant by these statements was that disclosing information

about the possibility of fraud or loan losses in the program might endanger USAID funding for

AED.  Instead, Webber was instructed to "coordinate with HQ before you take action since this

now has become a corporate – not just a program – issue that could have and [sic] adverse

impact on organizational relationships, legal risks, etc."  The email closed by telling Webber that

if he had simply called the AED in D.C. and not bothered USAID, "we could have proceeded

without all the extra time and effort this has now taken."

       25.     Webber decided in response to the instruction from AED management that

he had fiduciary duties as Chief of Party that were inconsistent with the instructions that he had

received.  Webber wrote to management to say that it should be disturbed but not about his

initiatives with the USAID mission in Kabul.  He said that he was concerned about the

governance process that had been followed under the ARIES Program, and he had been working

to improve governance and the Client Visitation Program was one way to do that and to get a

handle on how U.S. taxpayer funds were loaned and accounted for.

       26.     At Webber's initiative and because of his concern about ARFC's lending

activities, Webber and USAID called for a meeting of the AFRC board which met on May 27,

2008, at the USAID compound in Kabul.  Besides members of the ARFC board of directors

being in attendance, Webber, Paul Bundick (AED), and two USAID officials were present.

During this meeting, ARFC disclosed that it had used USAID funds to make a $300,000

payment to The Southern Company, a local Afghan company.  There was no apparent business

purpose in the payment, and Webber after investigating concluded that the payment was

fraudulent.

       27.     Webber reported to AED's senior management what he had learned about

the $300,000 payment including his conclusion that the payment of this fee was unlawful, and he

expressed his conclusion that ACDI/VOCA had been unwilling to supervise ARFC.  Webber

also told AED's management that ACDI/VOCA had been unwilling to take effective, immediate

steps to secure repayment of the $300,000.  Despite Webber's strong urging, AED management

was unwilling to support him sending a message to ACDI/VOCA about its failure of supervision

and its unwillingness to demand repayment of the $300,000.  AED management insisted that

Webber not demand that ACDI/VOCA return this money.

28.     Eventually, the Inspector General of USAID took the position in

discussions with AED that the $300,000 payment was improper and it must be repaid.  AED

refused to demand that ACDI/VOCA repay the money; instead, it offered to repay the $300,000

from its own funds.

29.     Webber remained concerned about the ARFC $4.3 million loan for the

pomegranate facility and he informed AED management that he should complete his review of

the loan.  In order to complete the review, Webber needed to obtain the complete credit file from

ARFC and, depending on the results of that review, to visit the facility.  ARFC was unwilling to

provide the complete credit file and ACDI/VOCA officials complained to AED management

about Webber's interference.  AED management instructed Webber to be collaborative and not

demand production of the credit file.  Webber was concerned that the suspicious $4.3 million

loan might be connected to the illegal $300,000 payment, but was never allowed sufficient

access to ARFC documents to make this determination.

30.     In late May or June, AED decided at Webber's urging to undertake a mid-

term technical review of the activities under the ARIES program.  Webber expressed his view

often that U.S. taxpayer funds had been put at risk by ARFC's imprudent lending activities and

he was concerned that unless strong corrective actions were taken, additional U.S. taxpayer funds

would be put at risk of being lost to fraud and/or mismanagement.  Webber believed that the mid-term technical review was an opportunity for AED to assume leadership in working with ACDI/VOCA to correct ARFC's deficiencies in loan origination and documentation, internal controls, governance, risk management, and related matters.

31.    In summer 2008, ACDI/VOCA lobbied with AED senior management that Webber be restricted in his dealings with ACDI/VOCA because he had not been sufficiently "collaborative."  AED senior management agreed with ACDI/VOCA that it would restrict Webber's supervision.  Senior management also agreed with ACDI/VOCA that it would share the results of the mid-term technical review with it before those results were shown to USAID. The agreement to share the results of the independent review with ACDI/VOCA before those results were shown to USAID was highly unusual.

32.    AED management informed Webber that it was concerned about "protecting" its relationship with ACDI/VOCA, including work that it was doing with it in countries other than Afghanistan.  When the mid-term technical review began in fall 2008, Webber was prepared to work with Grant Thornton, which had been hired to perform the review, to share with its officials what he had learned as Chief of Party about the lending activities. Within days of when Grant Thornton began its work, senior management instructed Webber to step aside and cease serving as the contact person with Grant Thornton.  AED's management's purpose in so instructing Webber was to avoid having him disclose what he had learned while Chief of Party about the poor supervision in the spending of U.S. taxpayer monies.

33.    Webber periodically sought assistance from senior AED management for a forceful response to ACDI/VOCA's deficiencies in supervision of ARFC.  On each occasion, he was not supported and, instead, he was told to take a more collaborative approach.

34.     In late summer 2008, USAID commissioned Chemonics to conduct a study of what would happen to the numerous loans at the end of the three year period when the ARIES Program was scheduled to end.  This study agreed with Webber's conclusions about ARFC's activities and the risk to taxpayer funds.  The Chemonics study identified numerous serious problems that needed immediate attention including the lack of a proper governance process, loan portfolio and risk management issues, inadequate loan loss reserves, the size of credits, capitalization of interest, consistent push-back by ACDI/VOCA, and the potential conflict of interest between AED and ACDI/VOCA.  Webber had frequently raised all of these issues with AED management and demanded that something had to be done to supervise the activities of the partners, especially ACDI/VOCA.  The Chemonics study also reviewed the ARFC loan activities and concluded:  "funding should be frozen and servicing of its book of loans performed by another organization not ACDI/VOCA (due to a history of poor management of this component of ARIES) with the aim of recovering as much of the public funds as possible."

35.     Webber complained frequently to senior AED management about the failure of ACDI/VOCA to report accurately about the status of the loans that it had made with U.S. taxpayer funds.  Among Webber's complaints was that ARFC had allowed many of its borrowers, including the $4.3 million pomegranate facility, to capitalize interest, i.e., to deduct interest payments from future advances or to increase the amount of the outstanding loan by the amount of the interest.  As a result of this practice, ARFC reported that there were no delinquencies on any of the loans that it had made with the $16+ million in U.S. taxpayer funds.  Webber repeatedly told senior AED management that ARFC's reporting about the status of its loans was highly suspect.  Webber believed that reporting that the loan portfolios were not

delinquent amounted to a materially false statement that allowed AED and ARFC to continue to benefit from additional USAID funds.

36.     Webber urged AED senior management to take a hard line with ARFC and to demand that it cease allowing borrowers to capitalize interest.  Webber was instructed that he was not to issue any such instructions to ARFC, in part because AED was concerned about its relationship with ACDI/VOCA in countries other than Afghanistan and its interest in working with ACDI/VOCA on other projects.

37.     If ARFC had refused to structure the loans to Afghan borrowers with capitalized interest, a substantial portion of the loans made by ARFC would have been correctly reported as delinquent.  AED was concerned that reporting a high percentage of delinquent loans to USAID would have caused USAID to cut off funding in Year III, and AED senior management instructed Webber that he was to pursue a "collaborative approach" rather than demand that interest not be capitalized.  The failure to demand that interest not be capitalized and be paid currently, under these circumstances, had no legitimate purpose other than to allow AED to paint a false picture of the success of the program to USAID and obtain additional funding from USAID.

38.     A substantial portion of the loans that ARFC made went to borrowers who were incapable of repaying the loans.  Although AED senior management was informed that a substantial portion of the ARFC loans were made to borrowers that could not or would not repay them, senior management resisted AED taking any steps that might cause USAID to reduce or eliminate funding for ACDI/VOCA.  AED senior management refused to authorize Webber to demand that ARFC accurately report the status of repayments on the loans, with the result that USAID received inaccurate reports about the loans and made funding decisions based on such

inaccurate reports. The result of such action by AED was that USAID continued to fund ACDI/VOCA, which used the money to capitalize ARFC and allow ARFC to make loans, many of which would not be repaid.

39.     On November 7, 2008, Paul Bundick wrote to Webber to say that the mid-term technical review needed to be completed "on an amicable basis" and it should be used to "re-establish [AED's] working relationship" with ACDI/VOCA. He also told Webber that he would be required not to directly supervise ACDI/VOCA, but instead he should "sit this out on the sidelines." The decision of AED senior management to restrict Webber's authority to supervise ACDI/VOCA was the result of Webber having complained about the illegal loans to Iran, the fraudulent payment of the $300,000, the practice of capitalizing interest and not accurately reporting the status of loans, and the complete lack of serious, sustained supervision by ACDI/VOCA of the ARFC lending activities.

40.     On December 11, 2008, Mark Ketcham, the Vice President of the Center for Enterprise and Capacity Development, wrote to Webber to inform him that he had been given a salary increase for the coming year of 3.5%. Ketcham thanked Webber for his contributions to AED and he said that the Center for Enterprise and Capacity Development "is successful because of your efforts and commitment to our work." He said that AED had had a successful year and he said that he "look[ed] forward to working" with him in the coming year.

41.     On January 16, 2009, Webber received a letter hand-delivered from Ketcham telling him that he was fired. The letter said that AED had "closely examined" the needs of ARIES and they had decided to make changes that "require[d]" the abolishment of Webber's position.

42.     On January 17, 2009, in an apparent recognition that the January 16 letter had been hastily written (Ketcham's name had been misspelled), Ketcham wrote to Webber again to say that his employment had been terminated because of a new emphasis in the ARIES Program which required someone with "in-depth rural agricultural enterprise development experience." AED took the position, which it has since repeated, that because Webber did not have such skills, his employment was terminated.

43.     AED was required by USAID regulations to inform the USAID Mission in Kabul prior to finalizing its decision to replace Webber as Chief of Party. AED did not so inform the USAID Mission in Kabul of its decision to replace Webber.

44.     In 2008, Webber had worked closely with officials at the USAID Mission in Kabul, the five partner organizations, and senior AED management to prepare and adopt a detailed work plan for Year III of the ARIES Program. The number of hours spent on the work plan ran well into the hundreds of hours. No one at USAID said anything during this process about changing the focus of the ARIES Program.

45.     The USAID Mission in Kabul and senior AED management adopted the Year III work plan in the fall 2008. Nothing in that work plan suggests that there was to be a change in focus of the ARIES Program. If the focus of the ARIES Program had changed in Year III, the USAID Mission in Kabul would have known of the change and would have had to approve the change.

46.     No one from the USAID Mission in Kabul told the five partner organizations that there had been a change in the focus of the ARIES Program to focus on rural agricultural enterprise development nor did AED so inform the partners. As far as the USAID mission and the partners understood, the focus of the ARIES Program in Year III was a

continuance of the Year II focus. In fact, the focus of the ARIES Program in Year III remained the same, the Program as conducted in the field did not change, and USAID officials at the Mission in Kabul did not notice any change in the work performed.

47.     The reaction of the USAID Mission in Kabul to the news of Webber's termination was complete surprise.  The Mission did not request Webber's termination nor had the Mission expressed concern about Webber's performance.  Throughout his tenure as Chief of Party, the Mission had been completely satisfied with the work that Webber had done as Chief of Party.

48.     The news of Webber's termination as Chief of Party was unwelcome at the USAID Mission.

## COUNT I
## Violation of Whistleblower Provision of False Claims Act

49.     Plaintiff incorporates by reference the allegations of paragraphs 1-48.

50.     As AED Chief of Party in Afghanistan, Webber determined that conduct by the five partner organizations, especially ACDI/VOCA, constituted fraud, misconduct, and violations of USAID rules and accepted standards of practice.  Webber also determined that certain actions by the USAID fund recipients had violated the laws of the United States.

51.     Webber informed AED that conduct by the five partner organizations constituted fraud, misconduct, and violations of USAID rules and accepted standards of practice, and he informed AED that certain conduct violated the laws of the United States.  Webber made the same disclosure to USAID.

52.     AED objected to Webber informing USAID of his conclusions as described in paragraphs 50 and 51, and AED instructed him to cease bringing such conclusions to the attention of USAID.

53.     AED terminated Webber's employment after learning that Webber had informed USAID of the conclusions described in paragraphs 50 and 51.

54.     AED's motive in terminating Webber's employment was retaliation for Webber having engaged in the protected activity described above.

55.     AED's proffered reason for terminating Webber was that he lacked "in-depth rural agricultural enterprise development experience."  This reason is a pretext for AED's decision to retaliate against Webber.

56.     AED's decision to terminate Webber's employment violates section 3730(h) of the False Claims Act.

## **Prayer for Relief**

WHEREFORE, Robert E. Webber demands judgment against Academy for

Educational Development as follows:

      a.      Damages reflecting two times the amount of back pay;

      b.      Interest on the back pay;

      c.      Compensation for special damages including emotional distress; and

      d.      Costs including reasonable attorney's fees.

**Plaintiff Demands Trial by Jury**

Date:   May 17, 2011

Respectfully submitted,

**Robert E. Webber**

By His Attorneys,

**COVINGTON & BURLING LLP**

*Michael A. Schlanger*

Michael A. Schlanger (D.C. Bar # 88849)
Email: mschlanger@cov.com
1201 Pennsylvania Avenue, NW
Washington, DC  20004
Tel.: (202) 662-5459

Robert P. Haney, Jr.
Email: rhaney@cov.com
The New York Times Building
620 Eighth Avenue
New York, NY  10018-1405
Tel.: (212) 841-1062

**VITT & RATTIGAN, PLC**

Geoffrey J. Vitt (D.C. Bar # 325944)
Email: gvitt@vittrattigan.com
Elizabeth K. Rattigan
Email:  erattigan@vittrattigan.com
8 Beaver Meadow Rd.
P.O. Box 1229
Norwich, VT 05055
Tel.: (802) 649-5700

Attorneys for the Plaintiff